Mieke K. Malmberg (SBN 209992)
mmalmberg@skiermontderby.com
**SKIERMONT DERBY LLP**
800 Wilshire Blvd., Ste. 1450
Los Angeles, CA 90017
Phone: (213) 788-4500
Fax: (213)788-4545

Jaime K. Olin (SBN 243139)
jolin@skiermontderby.com
Paul J. Skiermont (*pro hac vice* to be filed)
pskiermont@skiermontderby.com
**SKIERMONT DERBY LLP**
1601 Elm St., Ste. 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601

*Attorneys for Plaintiff*
CAO GROUP, INC.

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION**

| | |
|---|---|
| CAO GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY, and THE PROCTER & GAMBLE DISTRIBUTING LLC,<br><br>Defendants. | CASE NO. 5:22-cv-00142<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff CAO Group, Inc. ("CAO" or "Plaintiff") by and through the undersigned counsel, hereby files this Complaint and makes the following allegations of patent infringement relating to U.S. Patent Nos. 10,603,259 and 10,646,419 against The Procter & Gamble Company and The Procter & Gamble Distributing LLC (collectively, "P&G" or "Defendants"):

## PARTIES

1. Plaintiff is a Utah corporation with a principal place of business at 4628 West Skyhawk Drive, West Jordan, UT 84084.

2. Defendant The Procter & Gamble Company ("P&G Co.") is a multinational conglomerate incorporated in Ohio with its principal place of business at One Procter & Gamble Plaza, Cincinnati, Ohio 45201.

3. Upon information and belief, Defendant The Procter & Gamble Distributing LLC ("P&G Distributing") (also known as Procter & Gamble Distributing LLC) is a Delaware entity with a registered agent in California at CT Corporation System, 330 North Brand Blvd., Suite 700, Glendale, CA 91203.

## JURISDICTION AND VENUE

4. This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1338(a).

5. This Court has specific and general personal jurisdiction over Defendants pursuant to due process and/or the California Long Arm Statute because Defendants have committed acts within the State of California and this District giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over each Defendant would not offend traditional notions of fair play and substantial justice.

6. Defendants directly or through their agents have committed and continue to commit the infringement alleged herein, and regularly do or solicit business, and

engage in other persistent courses of conduct within the State of California and this Judicial District.

7. This Court has personal jurisdiction over P&G Co., which purposefully avails itself of the California market and distributes, makes, has made, sells, and/or offers to sell products throughout this State and Judicial District, including infringing Crest 3D Whitestrip products that are the subject of this Complaint.

8. This Court has personal jurisdiction over P&G Distributing, which purposefully avails itself of the California market and distributes, makes, has made, sells, and/or offers to sell products throughout this State and Judicial District, including infringing Crest 3D Whitestrip products that are the subject of this Complaint.

9. Venue is proper as to both Defendants under 28 U.S.C. § 1400(b) because both Defendants have committed acts of infringement within this District, as further detailed herein, and each Defendant has a regular and established places of business within this Judicial District. Those places of business include those identified below. *TC Heartland LLC v. Kraft Food Grp. Brands LLC*, 137 S. Ct. 1514 (2017).

10. P&G Co. has at least one regular and established place of business at 16110 Cosmos Street in Moreno Valley, California, which resides within Riverside County and this Judicial District. On information and belief, including a search and cross-check of Dunn & Bradstreet physical locations for P&G Co., P&G Co. has additional regular and established places of business in this District.

11. P&G Co.'s business at 16110 Cosmos Street is a greater than one million square foot warehouse and distribution center known as P&G's "West Coast Mixing Center" *See* [*https://www.pgplantjobs.com/WCMC#page*](https://www.pgplantjobs.com/WCMC#page) (last visited 01/24/2022).

12. P&G describes the functionality of its West Coast Mixing Center as follows:

**BRANDS AND PRODUCTS**

We partner with the P&G manufacturing sites across North America to customize shipment orders to get into the hands of consumers like you. In doing so, we contribute to improving the lives of those that use our products by working to keep shelves stocked and ready.

Different from our manufacturing sites that may specialize in specific brands, you will likely have the opportunity to work with ALL of our North America P&G brands. We act as the driving force across our North America Product Supply network, brining different P&G products together in order to send out the specific requests to each of our customers, which include Walmart, Target, and Costco just to name a few!

https://www.pgplantjobs.com/WCMC#brands (last visited 01/24/2022).

13. Upon information and belief, P&G Co. and/or P&G Distributing distribute to customers throughout this State and Judicial District P&G products via this West Coast Mixing Center, including infringing Crest 3D Whitestrip products.

14. P&G further states: "The West Coast Mixing Center became a P&G-operated site on May 1, 2019." https://www.pgplantjobs.com/WCMC#page (last visited 01/24/2022).

15. P&G Co. owns and/or operates the crest.com domain, a fully interactive website accessible via this State and District, through which one or both Defendants sell and offer to sell infringing Crest 3D Whitestrip products. This crest.com website is specifically directed to the State of California, as indicated by a link on its front page to a California Consumer Privacy Rights page. *See* *https://privacypolicy.pg.com/en/#CCPA* (last visited 01/24/2022).

16. P&G Co. is listed as the "Registrant Contact," "Administrative Contact," and "Technical Contact" for the crest.com domain. (See Exhibit A).

17. Upon information and belief, P&G Distributing has done and is doing business as P&G Oral Health.

18. Upon information and belief, P&G Distributing, doing business as (d/b/a) P&G Oral Health, sells, offers to sell, fills orders, and distributes oral health products to dental professionals via the website: https://crestoralbproshop.com/. *See also, e.g.*, https://crestoralbproshop.com/80346091.html ("All merchandise will be shipped by P&G Oral Health. All orders are subject to approval and acceptance by P&G Oral Health.") (last visited 01/24/2022).

19. The crestoralbproshop.com website sells and offers to sell infringing Crest 3D Whitestrip products at issue in this Complaint. *See* https://crestoralbproshop.com/whitening/crest-whitestrips.html (last visited 01/24/2022).

20. P&G Distributing, d/b/a P&G Oral Health has disclosed that Professional Crest Whitestrips have been sold to more than 50,000 dental offices, and that to protect the exclusivity of Professional Crest Whitestrips to dental offices, such dental offices were required to sign an agreement with P&G Oral Health prohibiting the resale of Professional Crest Whitestrips to persons other than patients under their care, and that until a dental office signs the agreement and returns it to P&G Oral Health: "We will not be able to fulfill future orders until we have your agreement on file." *See* Exhibit B.

21. P&G Distributing has at least one regular and established place of business in this District at 24015 Iris Ave. in Moreno Valley, California, which resides within Riverside County and this Judicial District. On information and belief, including a search and cross-check of Dunn & Bradstreet physical locations for P&G Distributing, P&G Distributing has additional regular and established places of business in this District.

22. Upon information and belief, P&G Distributing has sold and offered for sale, infringing Crest 3D Whitestrip products to dental offices both in the State of California and this Judicial District, including, without limitation, via the crestoralbproshop.com website.

23. Defendants have derived substantial revenues from their activities, including their infringing acts, occurring within the State of California and within this District.

## FACTUAL BACKGROUND

24. The CAO Group was founded by Dr. Densen Cao in Salt Lake County, Utah in 2000, following Dr. Cao's completion of Ph.D. studies in Materials Science and Engineering from the University of Utah, and serving as a staff engineer at Fairchild

Semiconductor. Prior to founding the CAO Group, Dr. Cao also served as coordinator of materials science at Clinical Research Associated, where he examined dental materials, such as glass ionomers and their fluoride release, the properties of composites and adhesives, and dental equipment.

25. In connection with years of research and development, the CAO Group researched, developed, and patented ground-breaking inventions and advancements in the dental, oral health, and LED fields, publicly disclosing their novel inventions in more than 190 issued and published patent applications world-wide.

26. For example, Dr. Cao invented LED curing light technology for use in dental applications, which nearly all major dental manufacturers have licensed. Dr. Cao also invented LED light sources for general lighting purposes which have been widely adopted by nearly all providers in the lighting field.

27. The CAO Group also developed and patented technology underlying the first compact and portable soft-tissue diode laser, receiving several patents in the process, including, but not limited to U.S. Patent Nos. 7,485,116; 8,337,097; 8,834,457; 8,961,040; and 9,967,883. These diode laser technologies are prolific throughout dental practices, and major companies in this field license CAO's technology.

28. In 2006, the CAO group moved to their 60,000 square-foot facility in West Jordan, Utah, which houses its Research and Development, Engineering, Manufacturing, Global Logistics, Customer Support, Marketing and Sales teams.

29. Advanced dental strip technologies to deliver various medications and other ingredients, including improved professional whitening products, were created at the CAO Group. These improved dental whitening strips contained chemical compositions that permitted higher concentrations of active whitening agents with an improved fit to conform to teeth, which accordingly delivered faster and improved results in a shorter time. The CAO Group's development efforts in this field resulted in the U.S. Patent Office granting CAO numerous patents.

30. In 2010, the CAO Group launched its Sheer White! Teeth Whitening Strips for dental patient's in-home use. The CAO Group advertises that while wearing this product, the user "[m]ay continue to speak, do light activities, and drink cool beverages." https://caogroup.com/products/sheer-white-take-home (Last visited 01/24/2022).

31. In 2010, the CAO Group also entered into an exclusive distribution relationship regarding its core products (including Sheer White! Whitening Strips) with Henry Schein, the world's largest distributor of professional dental equipment and supplies.

32. The CAO Group's Sheer White! Whitening Strips became the top selling teeth whitening product within this Henry Schein distribution channel.

33. In 2015 the CAO Group launched its Sheer White! In-Office Teeth Whitening Strips, which are for use within dental offices.

**ASSERTED U.S. PATENT NO. 10,603,259**

34. Plaintiff CAO owns U.S. Patent No. 10,603,259 (the "'259 Patent"), and holds all substantial rights, title, and interest in and to the '259 Patent. A true and correct copy of the '259 Patent is attached hereto as Exhibit C.

35. The '259 Patent is entitled "Peroxide Gel Compositions." The '259 Patent issued on March 31, 2020 from U.S. Patent Application No. 15/488,293, filed April 14, 2017. The '259 Patent ultimately claims priority to an application filed February 8, 2006.

36. Mr. Steven D. Jensen, a CAO chemist, is an inventor of CAO's '259 Patent. Mr. Jensen has worked with CAO for more than fifteen years, during which time he has served and continues to serve as a prolific inventor, including of more than sixty CAO U.S. patents and published applications. As a chemist at CAO, Mr. Jensen contributed numerous innovations including advanced teeth whitening strips, root canal disinfection, reversible cement, disinfection products, and many others. Prior to joining CAO, Steve Jensen worked as a chemist for several years at Ultradent, a

global dental manufacturing company, during which time he contributed to the development of many products including whitening, pit and fissure sealants, pulp capping agent, luting cement, bonding agents, and caries detection technologies. Mr. Jensen has also lectured nationally on the topic of oral healthcare science and technology. Plaintiff has requested the U.S. Patent Office to add Dr. Densen Cao as a co-inventor on the ’259 Patent, pursuant to 35 U.S.C. §256 and 37 CFR § 1.324.

37. The ’259 Patent generally describes dental bleaching devices such as a flexible backing material with a dental composition containing various agents. (’259 Patent, Abstract.)

38. The ’259 Patent discloses numerous problems with prior art dental bleaching approaches. For example, fluids or higher-viscosity fluidic gels used in prior art dental trays or dental strips would be messy, they would not remain in or on dental trays and strips, they were not sufficiently adhesive to remain on the teeth, and various prior art strips would fail to contact uneven teeth, creating gaps that would allow saliva to enter and dilute and wash away the gel; (’259 Patent, 2:50-3:50).

39. In addition, more rigid or solidified prior art compositions either involve two-part treatments that required combination immediately prior to use, which could be messy and inconvenient, and could not be stored in pre-mixed shelf-stable compositions because they would decompose into a dry powder and degraded peroxide, and/or the more rigid compositions would crack or break when flexed. (’259 Patent, 3:51-4:19)

40. The ’259 Patent discloses improved dental bleaching devices that use compositions with thickening agents that include at least Poly(2-ethyl-2-oxazoline) or polyvinylpyrrolidone (“PVP”) in a manner that allows higher concentrations of peroxide bleaching agent to be used, in a highly viscous composition that can be stored at room temperature for six months. (’259 Patent, 6:28-43; 10:3-7).

41. The ’259 Patent further discloses that:

> [T]he gels form a bleaching compound that will conform to a user's dental arches and form a bleaching tray **10** without cracking or breaking (FIG. **3).** The resultant compound is visco-elastic, and gelatinous, having a flexibility and consistency similar to the popular confection known as gummi worms, and will deform when removed from the backing material. The resultant tray is initially planar; with a significant body of gelatinous whitening composition adhered to the backing.

('259 Patent, 8:16-24).

42. The '259 Patent also discloses:

> For purposes of this Application, the term "gelatinous" shall have the definition given first in the American Heritage Dictionary of the English Language, Fourth Edition, ©2006 by Houghton Mifflin Co.: "resembling gelatin, viscous." A gelatinous compound shall be a visco-elastic compound having physical deformation properties between a solid and a fluid. A solid shall be defined as a substance that is sufficiently rigid so that it maintains its form indefinitely, independent of any structure or support. A fluid shall be defined as a substance that will conform and coalesce to the shape of a beaker into which multiple samples of the same substance are placed, within 10 minutes, with hand agitation of the container and/or hand mixing with an implement at 25° C. with an atmospheric pressure of 1 ATM. Therefore, a gelatinous compound, as the term is used in this Application, will have some degree of flex and deformation as required to fit inside a container, but will not coalesce so that a specific sample or portions thereof are still determinable. This is particularly evident if a number of discrete units of gelatinous material are placed in a container-they will bend as they contact the container but will not merge into one body.

('259 Patent, 5:49-6:3).

43. The inventive subject matter of the '259 Patent is characterized by its three independent claims and 30 total claims, interpreted in view of its specification and prosecution history. Claim 1 of the '259 Patent is set forth below:

> **1.** A dental bleaching device, comprising:
>
> a dental bleaching device comprising a dental composition on a strip of backing material, wherein the strip of backing material is flexible and insoluble in water;
>
> wherein the dental bleaching device is packaged in a package;

wherein the dental composition, when applied on the strip of backing material, comprises a peroxide bleaching agent, a first solvent, and a thickening agent;

wherein the first solvent is water;

wherein the thickening agent is at least one of poly(2-ethyl-2-oxazoline) and polyvinylpyrrolidone;

wherein, when the dental composition is applied on the strip of the backing material, the thickening agent is included in an amount more by weight of the dental composition than the water;

wherein the dental composition is dried after being applied on the strip of backing material;

wherein the dental composition is gelatinous and viscoelastic

(a) after the dental composition has been applied on the backing material and dried,

(b) during storage of the dental bleaching device at room temperature for a period of time up to six months in the package,

(c) after the dental bleaching device has been removed from the package, and

(d) when the dental composition is flexibly positioned on teeth; and

wherein the dental composition has physical deformation properties such that, after the dental bleaching device has been removed from the package, the dental composition may be positioned on surfaces of adjacent teeth in a dental arch, bend and conform to surfaces of adjacent teeth in a dental arch and remain on the strip of backing material during use.

44. The ’259 Patent prosecution history establishes that the Patent Examiner conducted prior art and/or other searches using at least the patent examiner system Examiner Automated Search Tool (“EAST”), across multiple databases, including the Pre-Grant Publications (US-PGPUB), United States Patents (USPAT), United States Optical Character Recognition (USOCR), European Patent Office (EPO) Abstracts, Japanese Patent Office (JPO) Abstracts, and Foreign Patent Retrieval System (FPRS) , Derwent, and IBM Technical Disclosure Bulletin databases, and performed searches

on at least May 17, 2017; May 30, 2017; June 1, 2017, November 25, 2017, September 3, 2018; April 1, 2019; May 15, 2019; May 17, 2019; September 24, 2019; and January 6, 2020. The Patent Examiners formally cited at least eight (8) separate references during the prosecution of the ’259 Patent.

45. Between the prior art references located and cited by the Patent Examiner, and the references submitted by the applicants and considered by the Patent Examiner during the prosecution of the ’259 Patent, at least forty-four (44) references were formally considered by the Patent Examiner, as indicated on the front two pages of the issued ’259 Patent.

46. It is the practice of the USPTO not to cite excessive cumulative art. For this reason, the art cited by the Patent Examiners is representative of considerable other art located by the USPTO and not cited. It is also the practice of the USPTO to discuss in its Office Actions those references of which the Patent Examiners are aware that most closely resemble the claimed inventions.

47. The issued claims from the ’259 Patent are patentably distinct from the at least 44 references identified and/or discussed during prosecution. That is, each of the 30 claims, as a whole were found to be patentably distinct from at least the 44 formally identified references. And throughout the prosecution history, the applicant successfully distinguished several prior art references with specific reference to claim elements and novel combinations of claim elements that establish the claimed dental devices are different than numerous prior art systems the Examiners identified.

48. By issuing the ’259 Patent, each of the claims was shown to be inventive, novel, non-obvious, and innovative over at least the disclosures in the 44 identified references.

**ASSERTED U.S. PATENT NO. 10,646,419**

49. Plaintiff CAO owns U.S. Patent No. 10,646,419 (the “’419 Patent”), and holds all substantial rights, title, and interest in and to the ’419 Patent. A true and correct copy of the ’419 Patent is attached hereto as Exhibit D.

50. The ’419 Patent is entitled “Peroxide Gel Compositions.” The ’419 Patent issued on May 12, 2020 from U.S. Patent Application No. 15/627,906, filed June 20, 2017. The ’419 Patent ultimately claims priority to an application filed February 8, 2006.

51. Mr. Steven D. Jensen, a CAO chemist, is an inventor of CAO’s ’419 Patent. Mr. Jensen has worked with CAO for more than fifteen years, during which time he has served and continues to serve as a prolific inventor, including of more than sixty CAO U.S. patents and published applications. As a chemist at CAO, Mr. Jensen contributed numerous innovations including advanced teeth whitening strips, root canal disinfection, reversible cement, disinfection products, and many others. Prior to joining CAO, Mr. Jensen worked as a chemist for several years at Ultradent, a global dental manufacturing company, during which time he contributed to the development of many products including whitening, pit and fissure sealants, pulp capping agent, luting cement, bonding agents, and caries detection technologies. Mr. Jensen has also lectured nationally on the topic of oral healthcare science and technology. Plaintiff has requested the U.S. Patent Office to add Dr. Densen Cao as a co-inventor on the ’419 Patent, pursuant to 35 U.S.C. §256 and 37 CFR § 1.324.

52. The ’419 Patent and ’259 Patent issued from applications that were each continuation applications stemming from the same parent application, namely, Patent Application No. 14/710,416 (now Patent No. 9,789,036). Accordingly, the specifications of the ’419 Patent and ’259 Patent are substantively identical, and the disclosures discussed above with respect to the ’259 Patent at paragraphs 37-42 apply likewise to the ’419 Patent, and such paragraphs are fully incorporated as if made here for the ’419 Patent.

53. The inventive subject matter of the ’419 Patent is characterized by its three independent claims and 35 total claims, interpreted in view of its specification and prosecution history. Claim 1 of the ’419 Patent is set forth below:

**1.** A dental bleaching device, comprising:

a strip of backing material, wherein the strip of backing material is flexible and planar such that the strip of backing material has two flat sides;

a dental composition on one of the flat sides of the strip of backing material such that at least substantially all of one side of the backing material is covered solely by the dental composition;

wherein the dental composition, when applied on the strip of backing material, comprises a peroxide bleaching agent, a first solvent, and a thickening agent;

wherein the first solvent is water;

wherein the thickening agent comprises is at least one of poly(2-ethyl-2-oxazoline) and polyvinylpyrrolidone;

wherein the dental composition is dried after being applied on the strip of backing material;

wherein the dental composition is gelatinous and viscoelastic

(a) after the dental composition has been applied on the backing material and dried,

(b) during storage of the dental bleaching device at room temperature for a period of time up to six months in a package,

(c) after the dental bleaching device has been removed from a package, and

(d) when the dental composition is flexibly positioned on teeth;

wherein the dental composition has physical deformation properties such that, after the dental bleaching device has been removed from the package, the dental composition may be positioned on surfaces of adjacent teeth in a dental arch, bend and conform to surfaces of adjacent teeth in a dental arch and remain on the strip of backing material during use; and

wherein the dental composition has adhesive properties such that, after the dental bleaching device has been removed from a package and is then positioned on adjacent teeth in a dental arch, the dental composition will adhere to surfaces of adjacent teeth in a dental arch.

54. The ’419 Patent’s prosecution history establishes that the Patent Examiner conducted prior art and/or other searches using at least the patent examiner system Examiner Automated Search Tool (“EAST”), across multiple databases, including the Pre-Grant Publications (US-PGPUB), United States Patents (USPAT), United States Optical Character Recognition (USOCR), European Patent Office (EPO) Abstracts, Japanese Patent Office (JPO) Abstracts, and Foreign Patent Retrieval System (FPRS) , Derwent, and IBM Technical Disclosure Bulletin databases, and performed searches on at least August 12, 2017; February 17, 2018; September 15, 2018; June 5, 2019, June 10, 2019; November 12, 2019; and February 2, 2020. The Patent Examiner formally cited at least seven (7) separate references during the prosecution of the ’419 Patent.

55. Between the prior art references located by and cited by the Patent Examiner, and the references submitted by the applicants and considered by the Patent Examiner during the prosecution of the ’419 Patent, at least forty-six (46) references were formally considered by the Patent Examiners, as indicated on the front page of the issued ’419 Patent.

56. It is the practice of the USPTO not to cite excessive cumulative art. For this reason, the art cited by the Patent Examiners is representative of considerable other art located by the USPTO and not cited. It is also the practice of the USPTO to discuss in its Office Actions those references of which the Patent Examiners are aware that most closely resemble the claimed inventions.

57. The issued claims from the ’419 Patent are patentably distinct from the at least 46 references identified and/or discussed during prosecution. That is, each of the 35 claims, as a whole were found to be patentably distinct from at least the 46 formally identified references. And throughout the prosecution history, the applicant successfully distinguished several prior art references with specific reference to claim elements and novel combinations of claim elements that establish the claimed dental devices are different than numerous prior art systems the Examiners identified.

58. By issuing the '419 Patent, each of the claims was shown to be inventive, novel, non-obvious, and innovative over at least the disclosures in the 46 identified references.

**P&G'S KNOWLEDGE OF THE CAO GROUP AND ASSERTED PATENTS**

59. P&G has long been familiar with the CAO Group, its whitening products, and CAO's U.S. intellectual property pertaining to its whitening technology, including the content of the Asserted Patents and their claims.

60. On or around May 20, 2013, P&G Co. (specifically, The Procter & Gamble Company) filed a complaint against the CAO Group in U.S. District Court for the Southern District of Ohio, Civil Action No. 1:13-cv-337, alleging, among other things, that the CAO Group's Sheer White! Whitening Films infringed three U.S. patents that P&G owned.

61. That litigation was dismissed on or around December 16, 2014, and CAO continued to sell its Sheer White! Whitening Films.

62. As outlined further below, between February 2015 and April 8, 2020, employees, officers, members, and/or agents of P&G and CAO conducted numerous discussions in person, by telephone, and via correspondence, to discuss P&G's potential collaboration and use of CAO's patented teeth whitening technology, including discussing the subject-matter and claims of CAO's Asserted Patents.

63. On or around February 20, 2015, P&G and CAO personnel met at P&G's Mason Business Center, where CAO presented information to P&G regarding CAO's sheer film and teeth whitening technologies. CAO attendees at this meeting included CEO Dr. Densen Cao, VP Technology and Quality Rob Larsen, and General Counsel Terry Jones. P&G personnel at this meeting included one or more of Don White (P&G R&D Oral Care—Research Fellow—Vic Mills Society), John Carson (P&G R&D Oral Care—Section Head), Amanda Berry (P&G General Consul—Personal Health Care and Oral Care), Pam Carey-Mackenzie (Associate Director – P&G

Global Business Development), and Nick Lorenz (P&G R&D Oral Care—Connect and Develop).

64. Upon concluding the February 20, 2015 meeting, and pursuant to a Materials Transfer Agreement between the parties dated the same day, CAO left various samples of its stain removal strips for evaluation and testing by at least P&G's Don White.

65. On April 12, 2017, Dr. Cao sent Ms. Pam Carey-Mackenzie (Associate Director – P&G Global Business Development) a list of CAO's intellectual property directed to teeth whitening technology, and identified U.S. Patent Application 14/710,416, the parent application to the Asserted Patents in this Complaint, which contains substantively the same specification as the Asserted Patents.

66. On April 19, 2017, Dr. Cao conducted a conference call with Ms. Carey-Mackenzie, and they discussed CAO's teeth whitening technology and its intellectual property directed to teeth whitening technology.

67. On June 23, 2017, Dr. Cao sent to Ms. Carey-Mackenzie and Mr. John Davies (Ms. Carey-Mackenzie's replacement following her retirement) a list of CAO's intellectual property directed to teeth whitening technology, and this list also identified U.S. Patent Application 14/710,416.

68. On June 28, 2017, Dr. Cao, Mr. Larsen (VP of Product Development at CAO), and Mr. Jensen (Chief Chemist at CAO) conducted a conference call with John Davies and Paul Sagel of P&G and they discussed CAO's teeth whitening technology and its intellectual property covering it.

69. P&G's Paul Sagel describes himself as "Top innovator at Procter & Gamble. Crest Whitestrips, Crest HD and others," and as "Top technologist at Procter &[] Gamble with primary focus on developing Oral Care products and technologies." *See* https://www.linkedin.com/in/paul-sagel-0936555/ (last visited 01/24/2022).

70. Within three weeks of the June 28, 2017 conference call between CAO and P&G, CAO provided samples of CAO's teeth whitening technology to P&G's Paul Sagel for testing and evaluation.

71. On July 27, 2017, P&G's Sagel sent an email to Dr. Cao confirming testing and evaluation of CAO's sample products, and he asked Dr. Cao technical questions regarding the sample products.

72. On November 6, 2017, Dr. Cao sent Sagel and Davies an email that informed each of them of CAO's U.S. Patent No. 9,789,036, and specifically highlighted claims to a new "gelatinous formulation." Dr Cao further wrote: "We are working on having similar claims with PVP and others."

73. CAO's U.S. Patent No. 9,789,036 issued from U.S. Patent Application 14/710,416 (as noted above, the parent application to the Asserted Patents).

74. On March 6, 2018, Dr. Cao conducted another conference call with P&G's Sagel, and they further discussed CAO's teeth whitening technology and its intellectual property protecting it.

75. On April 11, 2018, P&G's Sagel flew to Utah and personally met with Dr. Cao at CAO's facilities to discuss possible collaboration between P&G and CAO regarding CAO's patented teeth whitening technology.

76. On March 3, 2020, Dr. Cao sent an email to Sagel informing him that CAO's U.S. Patent Applications 15/488,293 and 15/627,906 had been "recently allowed and will be issued in next 30-60 days." These two U.S. patent applications issued as the Asserted Patents here.

77. On March 24, 2020, Dr. Cao sent another email to Sagel informing him when CAO's Asserted Patents would issue: "the patent in whitening strips with application # 15/488,293 will be issued on March 31, 2020. The patent in whitening strips with application # 15/627,906 will be issue[d] around end of April."

78. On March 24, 2020, P&G's Sagel sent an email to Dr. Cao confirming receipt of previous emails from Dr. Cao referencing U.S. Application Nos. 15/488,293

and 15/627,906, and further stating: "I will look at the claims and get back with you…."

79. On April 1, 2020, Dr. Cao sent Sagel an email providing further notice to P&G that: "The first patent was issued yesterday as expected. See enclosed." This email attached a copy of the '259 Asserted Patent.

80. On April 8, 2020, P&G's Sagel sent Dr. Cao an email stating: "I have reviewed the IP you sent with my team (virtually of course 😊). There was not enough interest given our current plans."

**<u>OVERVIEW OF P&G'S INFRINGING PRODUCTS</u>**

81. P&G makes, has made, uses, sells, and/or offers to sells in the United States a family of teeth whitening strip products branded as Crest 3D Whitestrips. P&G sells whitening strips under its Crest 3D Whitestrips family—which P&G directly advertises, offers for sale, sells, and distributes via P&G's crest.com website—including the following versions: "Classic White," "Glamorous White," "1 Hour Express," "Gentle Routine," "Professional 1 Hour Express," "Vivid White," and "Professional Effects" products. *See, e.g.*, <u>https://crest.com/en-us/oral-care-products/whitening-treatments</u> (Last visited 01/24/2022).

82. On the specific crest.com webpage for each of the above-identified Crest 3D Whitestrip products, each such product is advertised as "No-Slip Grip Whitening Strips":




*See, e.g.*, <u>https://crest.com/en-us/oral-care-products/bundles/the-classic-white-bundle</u> (Last visited 01/24/2022).

83. P&G states that its Crest 3D Whitestrips are flexible, and designed to conform to the shape of a user's teeth:

How do Crest 3D White Whitestrips work?

> Crest 3D White Whitestrips are thin, flexible strips that are coated with a tooth whitening gel containing peroxide. Designed to conform to the shape of your teeth, they work by keeping the whitening gel in place against your teeth to get at stain build-up on and below the tooth's surface.

https://crest.com/en-us/oral-care-tips/teeth-whitening/how-do-crest-3d-white-whitestrips-work (last visited 01/24/2022).

84. P&G's Crest 3D Whitestrips are specifically promoted as containing "No-Slip Grip" – which means using technology specifically designed so the strips "strongly adhere to your teeth." *See, e.g.*, https://caliwhite.com/pages/faq-crest-products (Last visited 1/24/2022).

85. P&G also makes, has made, uses, sells, and/or offers to sells in the United States those same products, and additional products, from its Crest 3D Whitestrip brand to third parties, who in turn sell and offer to sell them to consumers. For example, in addition to the products identified in paragraph 81, P&G makes, has made, uses, offers to sell and sells additional Crest 3D Whitestrip products to third-parties such as Walmart, including, for example Crest 3D Whitestrip products with No-Slip Grip such as "Professional White," "Supreme Bright," "Sensitive," "Luxe Professional Effects," "Luxe Glamorous White," "Classic Vivid," and "Brilliance White." *See, e.g.,* *https://www.walmart.com/search?q=crest%20whitestrips&typeahead=Crest and https://www.walmart.com/ip/Crest-3D-Whitestrips-Supreme-Bright-Teeth-Whitening-Strips-42-Ct-1-Pack/157177845* (Last visited 01/24/2022).

86. P&G also makes, has made, uses, sells and offers to sell additional Crest 3D Whitestrip products to other third-parties who resell them via platforms such as Amazon.com, including, for example Crest 3D Whitestrips products that have No-Slip Grip such as "Vivid Plus," "Crest 3D Whitestrips with Light," "Monthly Whitening Boost," and "Supreme Flexfit." *See, e.g.,* https://www.amazon.com/Crest-White-Whitestrips-Whitening-Strips/dp/B01M63SQTI?ref_=ast_sto_dp&th=1&psc=1(Last visited 01/24/2022).

87. Further, the specific Crest 3D Whitestrip products that P&G Distributing d/b/a P&G Oral Health sells and offers for sale on its crestoralbproshop.com website include, for example, its products designated as "Professional Supreme," and "Professional Exclusive," each of which has "no-slip" technology. *See, e.g.,* https://crestoralbproshop.com/whitening/crest-whitestrips.html (last visited 01/24/2022).

88. An examination of the labels on P&G's Crest 3D Whitestrips show they contain Polyvinylpyrrolidone (PVP), PEG-8, Water, Hydrogen Peroxide, Acrylates Copolymer, Sodium Hydroxide, and Sodium Saccharin. The textured whitening strips are made with an enamel-safe flexible plastic called Polyethylene. The backing is made with Polypropylene.

89. Upon information and belief, for at least the last several years, P&G's Crest 3D Whitestrips line of products generate annual U.S. sales in excess of $200 million.

**COUNT I**

**(Willful Infringement of U.S. Patent No. 10,603,259)**

90. Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

91. Plaintiff is informed and believes, and on that basis alleges, that the P&G Defendants have infringed and are currently infringing one or more claims (e.g., at least claim 1) of the '259 Patent, in violation of at least 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing whitening strips under the Crest 3D Whitestrips family, including, but not limited to, the Crest 3D Whitestrip versions identified in paragraphs 81, 85-87 (collectively, "P&G's Infringing Products"). For purposes of notice pleading, CAO shows below how Crest 3D Whitestrips Professional Effects infringe CAO '257 Patent claim 1 as exemplary of P&G's Infringing Products.

92. P&G's Infringing Products are "A dental bleaching device, comprising:"- P&G's Infringing Products are teeth whitening strips, as described in P&G's crest.com webpage at https://crest.com/en-us/oral-care-products/3d-whitestrips/professional-effects-twin-pack (last visited 01/24/2022).

93. "a dental bleaching device comprising a dental composition on a strip of backing material, wherein the strip of backing material is flexible and insoluble in water'"—P&G's Infringing Products include a dental composition on "thin, flexible strips that are coated with a tooth whitening gel containing peroxide" (*see* paragraph 83), and P&G's Infringing Products' textured whitening strips and their backings are made of polyethylene and polypropylene, respectively, which are both water insoluble.

94. "wherein the dental bleaching device is packaged in a package;"—P&G's Infringing Products are shipped and stored in separate foil packaging:




https://crest.com/en-us/oral-care-products/3d-whitestrips/professional-effects-twin-pack (Last visited 01/24/2022).

95. "wherein the dental composition, when applied on the strip of backing material, comprises a peroxide bleaching agent, a first solvent, and a thickening agent; wherein the first solvent is water; wherein the thickening agent comprises at least one of poly(2-ethyl-2-oxazoline) and polyvinylpyrrolidone;"—P&G's Infringing Products

have a dental composition applied on the strip of backing material that contain, among other ingredients, hydrogen peroxide (“a peroxide bleaching agent”), water (“a first solvent”), and PVP (“the thickening agent comprises at least one of… polyvinylpyrrolidone.”

96. “wherein, when the dental composition is applied on the strip of the backing material, the thickening agent is included in an amount more by weight of the dental composition than the water; wherein the dental composition is dried after being applied on the strip of backing material”—P&G’s Infringing Products dental compositions are dried after applied on the strips and contain ingredients including, among others, hydrogen peroxide, water, and polyvinylpyrrolidone (PVP) that are, respectively, “a peroxide bleaching agent,” “a first solvent,” and “a thickening agent;” and the Infringing Products list the order of ingredients on their packaging consistent with regulations pertaining to cosmetic labelling, where ingredients are listed in descending order of predominance (*see, e.g.*, 21 C.F.R. 701.3(a)). The exemplary Professional Effects version lists its ingredients in the following order: “PVP, PEG-8, Water, Hydrogen Peroxide, Acrylates Copolymer, Sodium Hydroxide, Sodium Saccharin,” and thus the dental compositions of P&G’s Infringing Products contain more PVP than water.

97. “wherein the dental composition is gelatinous and viscoelastic

> (a) after the dental composition has been applied on the backing material and dried,
> (b) during storage of the dental bleaching device at room temperature for a period of time up to six months in the package,
> (c) after the dental bleaching device has been removed from the package, and
> (d) when the dental composition is flexibly positioned on teeth;”—

P&G’s Infringing Products contain:

(i) the claimed dental composition that is gelatinous, as established, for example, by its ability to flex and deform when the Whitestrip is freshly “removed from its package” and a glass capillary is pressed against the strip, deforming only the dental composition and not the backing, and this deformation is reversible when pressure is

removed, as indicated in the 80X magnified images below taken via an optical microscope:




**Figure caption**. (a) whitestrip oriented perpendicular to observation plane, (b) same sample with glass capillary resting near surface with no applied pressure, and (c) same sample but with applied pressure. When the capillary is pressed against the Crest Whitestrip, there is only deformation of the gelatinous coating and not the underlying backing material. Photograph c displays compression of coating layer.

See also the following similar photographs:



(ii) the claimed dental composition that is viscoelastic, established based on the fact that the composition exhibits both viscous and elastic characteristics when undergoing deformation and/or strain such as when they are "flexibly positioned on the teeth." One technique to measure potential viscoelasticity in a gel-like material is small amplitude oscillatory shear (SAOS). As shown in a graph below, when the dental composition is isolated and dried, its SAOS data indicates viscoelastic behavior in that the storage modulus (representative of the elastic response and indicated by the red G' circles plotted below) increase with oscillatory frequency, while the blue squares plotted below represent the loss modulus (representative of the viscous response), similarly increase with oscillatory frequency, consistent with viscoelastic materials.




(iii) the claimed dental composition is gelatinous and viscoelastic, and the same endures six months after storage at room temperature, as established by the containers for the individually wrapped Whitestrips containing a "Best if used by" date that is typically at least one year after the Whitestrips are manufactured and packaged. P&G's crest.com website additionally shows that its teeth whitening kits are suitably stored at room temperature:

## Storage Tips For Tooth Whitening Kits

Most manufacturers recommend storing tooth whitening kits in a cool place. What does this mean? Anywhere in your home where heat isn't trapped in a confined space can be a great place to store tooth whitening kits when not in use.

For some, under the bathroom cabinet or in a linen closet is appropriate. Others who live in extremely warm climates may want to store tooth whitening kits in the refrigerator.

You may wonder if the steam and heat generated by bathroom showers will cause problems for your tooth whitening kits. But the limited amount of heat generated in these situations shouldn't have any negative effects on tooth whitening kits.

https://crest.com/en-us/oral-care-tips/teeth-whitening/how-do-i-store-my-teeth-whitening-kit (Last visited 01/24/2022).

98. "wherein the dental composition has physical deformation properties such that, after the dental bleaching device has been removed from the package, the dental composition may be positioned on surfaces of adjacent teeth in a dental arch, bend and conform to surfaces of adjacent teeth in a dental arch and remain on the strip of backing material during use." –P&G's Infringing Products have the claimed physical deformation properties, as established by the above photos showing the dental composition bending and deforming when pressure is exerted on it, as well as P&G's own advertising which states: "Crest 3D White Whitestrips are….***Designed to conform to the shape of your teeth***, they work by keeping the whitening gel in place against your teeth to get at stain build-up on and below the tooth's surface." https://crest.com/en-us/oral-care-tips/teeth-whitening/how-do-crest-3d-white-whitestrips-work (Emphasis added) (last visited 01/24/2022).

99. As shown in the exemplary infringement mapping above, P&G's Infringing Products satisfy, literally or under the doctrine of equivalents, each and every claim limitation of at least claim 1 of CAO's '259 Patent. CAO expressly reserves the right to identify additional asserted claims and products in its infringement contentions in

accordance with this Court's local rules. Claim 1 is provided for notice pleading only and is not presented as an "exemplary" claim of every CAO '259 Patent claim.

100. P&G's infringement is knowing, egregious, consciously wrongful, and willful. P&G learned of the allowed claims of the '259 Patent no later than March 3, 2020 via an email of the same date from Dr. Cao to Mr. Sagel. Dr. Cao similarly placed P&G on notice that the '259 Patent issued via an email dated April 1, 2020 to Mr. Sagel. Despite the efforts by CAO to have P&G enter into a business relationship or pay for a license to the '259 Patent, and knowing that they were infringing the '259 Patent, P&G instead chose to continue to infringe the '259 Patent.

101. To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been satisfied with respect to the '259 Patent.

102. As a result of P&G's infringement of the '259 Patent, CAO has been injured by P&G's unauthorized use of CAO's intellectual property. CAO seeks monetary damages in an amount adequate to compensate for P&G's infringement, but in no event less than a reasonable royalty, together with interest and costs as fixed by the Court, and CAO will continue to suffer damages in the future unless P&G's infringing activities are enjoined by this Court.

103. Unless an injunction is issued enjoining P&G and its agents, servants, employees, representatives, affiliates, and all others acting or in active concert therewith from infringing the '259 Patent, CAO will be greatly and irreparably harmed.

**COUNT II**

**(Willful Infringement of U.S. Patent No. 10,646,419)**

104. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-89, as if fully set forth herein.

105. Plaintiff is informed and believes, and on that basis alleges, that the P&G Defendants have infringed and are currently infringing one or more claims (*e.g.*, at

least claim 1) of the ’419 Patent, in violation of at least 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing P&G’s Infringing Products. For purposes of notice pleading, CAO shows below how Crest 3D Whitestrips Professional Effects infringe CAO ’419 Patent claim 1 as exemplary of P&G’s Infringing Products.

106. P&G’s Infringing Products are “A dental bleaching device, comprising:”— P&G’s Infringing Products are teeth whitening strips, as described in P&G’s crest.com webpage at https://crest.com/en-us/oral-care-products/3d-whitestrips/professional-effects-twin-pack. (Last visited 01/24/2022).

107. “a strip of backing material, wherein the strip of backing material is flexible and planar such that the strip of backing material has two flat sides”— P&G’s Infringing Products have the claimed strip of backing material, because they contain “thin, flexible strips that are coated with a tooth whitening gel containing peroxide” and examining such Products confirms the strips of backing material are planar with two flat sides:






https://crest.com/en-us/oral-care-products/3d-whitestrips/professional-effects-twin-pack (Last visited 01/24/2022).

108. “a dental composition on one of the flat sides of the strip of backing material such that at least substantially all of one side of the backing material is covered solely by the dental composition;”— P&G’s Infringing Products include the claimed dental composition, as established by the admission on P&G’s crest.com website stating that

only one of the sides of the whitening strip contains the gel side: "To apply, simply remove the whitening strip from its liner and place the gel side to your teeth, aligned with your gum line." https://crest.com/en-us/oral-care-tips/teeth-whitening/crest-whitestrips-instructions-safe-easy-teeth-whitening (Last visited 01/24/2022). The "gel side" of the whitening strip, contains the dental composition throughout the entire side of the whitening strip, and nothing other than this dental composition is contained on this "gel side" of the whitening strip.

109. "wherein the dental composition, when applied on the strip of backing material, comprises a peroxide bleaching agent, a first solvent, and a thickening agent; wherein the first solvent is water; wherein the thickening agent comprises at least one of poly(2-ethyl-2-oxazoline) and polyvinylpyrrolidone; wherein the dental composition is dried after being applied on the strip of backing material"—P&G's Infringing Products include the claimed dental composition, as established by the allegations in paragraph 95 above, which are expressly incorporated by reference in their entirety into this paragraph.

110. "wherein the dental composition is gelatinous and viscoelastic

> (a) after the dental composition has been applied on the strip of backing material and dried,
> (b) during storage of the dental bleaching device at room temperature for a period of time up to six months in a package,
> (c) after the dental bleaching device has been removed from a package, and
> (d) when the dental composition is flexibly positioned on teeth;"

P&G's Infringing Products include the claimed gelatinous and viscoelastic dental composition, as established by the allegations in paragraph 97 above, which are expressly incorporated by reference in their entirety into this paragraph.

111. "wherein the dental composition has physical deformation properties such that, after the dental bleaching device has been removed from a package, the dental composition may be positioned on surfaces of adjacent teeth in a dental arch, bend and conform to surfaces of adjacent teeth in a dental arch and remain on the strip of

backing material during use."—P&G's Infringing Product include the clamed dental composition physical deformation properties, as established by the allegations in paragraph 98 above, which are expressly incorporated by reference in their entirety into this paragraph.

112. "wherein the dental composition has adhesive properties such that, after the dental bleaching device has been removed from a package and is then positioned on adjacent teeth in a dental arch, the dental composition will adhere to surfaces of adjacent teeth in a dental arch."—P&G's Infringing Products have the claimed dental composition adhesive properties, as established in the photos below:




P&G's own advertisements for Crest 3D Whitestrips also confirm their adhesive nature, stating they "***work by keeping the whitening gel in place against your teeth*** to get at stain build-up on and below the tooth's surface https://crest.com/en-us/oral-care-tips/teeth-whitening/how-do-crest-3d-white-whitestrips-work ." (Emphasis added) (last visited 01/24/2022).

113. As established in the exemplary infringement mapping above, P&G's Infringing Products satisfy, literally or under the doctrine of equivalents, each and every claim limitation of at least claim 1 of CAO's '419 Patent. CAO expressly reserves the right to identify additional asserted claims and products in its infringement contentions in accordance with this Court's local rules. Claim 1 is provided for notice pleading only and is not presented as an "exemplary" claim of every CAO '419 Patent claim. CAO expressly reserves the right to identify additional

asserted claims and products in its infringement contentions in accordance with this Court's local rules. Claim 1 is provided for notice pleading only and is not presented as an "exemplary" claim of every CAO '419 Patent claim.

114. P&G's infringement is knowing, egregious, consciously wrongful, and willful. P&G learned of the allowed claims of the '419 Patent no later than March 3, 2020 via an email of the same date from Dr. Cao to Mr. Sagel. Despite the efforts by CAO to have P&G enter into a business relationship or pay for a license to the '419 Patent, and knowing that they were infringing the '419 Patent, P&G instead chose to continue to infringe the '419 Patent.

115. To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been satisfied with respect to the '419 Patent.

116. As a result of P&G's infringement of the '419 Patent, CAO has been injured by P&G's unauthorized use of CAO's intellectual property. CAO seeks monetary damages in an amount adequate to compensate for P&G's infringement, but in no event less than a reasonable royalty, together with interest and costs as fixed by the Court, and CAO will continue to suffer damages in the future unless P&G's infringing activities are enjoined by this Court.

117. Unless an injunction is issued enjoining P&G and its agents, servants, employees, representatives, affiliates, and all others acting or in active concert therewith from infringing the '419 Patent, CAO will be greatly and irreparably harmed.

## PRAYER FOR RELIEF

Plaintiff Cao Group Inc. prays for the following relief:

A. A judgment that P&G has infringed one or more claims of the '259 and '419 Patents;

B. A permanent injunction enjoining P&G and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others

acting in active concert or participation with P&G, from infringing the ’259 Patent or ’419 Patent;

C. An award of damages resulting from P&G’s acts of infringement in accordance with 35 U.S.C. § 284;

D. A judgment and order finding that Defendants’ acts of infringement were egregious and willful and trebling damages under 35 U.S.C. § 284;

E. A judgment and order requiring P&G to provide accountings and to pay supplemental damages to ASI, including, without limitation, prejudgment and post-judgment interest; and

F. Any and all other relief to which Plaintiff may show itself to be entitled.

Dated: January 25, 2022

/s/ *Mieke K. Malmberg*
Mieke K. Malmberg (SBN 209992)
mmalmberg@skiermontderby.com
**SKIERMONT DERBY LLP**
800 Wilshire Blvd., Ste. 1450
Los Angeles, CA 90017
Phone: (213) 788-4500
Fax: (213)788-4545

Jaime K. Olin (SBN 243139)
jolin@skiermontderby.com
Paul J. Skiermont (*pro hac vice* to be filed)
pskiermont@skiermontderby.com
**SKIERMONT DERBY LLP**
1601 Elm St., Ste. 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601

*Attorneys for Plaintiff*
CAO GROUP, INC.

**JURY TRIAL DEMANDED**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff CAO hereby demands a trial by jury of all issues so triable.

Dated: January 25, 2022

/s/ *Mieke K. Malmberg*
Mieke K. Malmberg (SBN 209992)
mmalmberg@skiermontderby.com
**SKIERMONT DERBY LLP**
800 Wilshire Blvd., Ste. 1450
Los Angeles, CA 90017
Phone: (213) 788-4500
Fax: (213)788-4545

Jaime K. Olin (SBN 243139)
jolin@skiermontderby.com
Paul J. Skiermont (*pro hac vice* to be filed)
pskiermont@skiermontderby.com
**SKIERMONT DERBY LLP**
1601 Elm St., Ste. 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601

*Attorneys for Plaintiff*
CAO GROUP, INC.